Eudene EUNIQUE, an Individual,
Plaintiff–Appellant,

v.

Colin L. POWELL,* the Secretary of
State for the United States,
Defendant–Appellee.

No. 99–56984.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 14, 2001.

Filed Aug. 23, 2002.

Eudene Eunique, Lucerne Valley, CA,
pro se.

Anh-Thu P. Mai, U.S. Department of
Justice, Office of Immigration Litigation,
Washington, DC, for the defendant-appel-
lee.

Before: FERNANDEZ, KLEINFELD,
and McKEOWN, Circuit Judges.

* Colin L. Powell is substituted for his predeces-
sor Madeline K. Albright as Secretary of State.   Fed. R.App. P. 43(c)(2).

Opinion by Judge FERNANDEZ.
Concurrence by Judge McKEOWN.
Dissent by Judge KLEINFELD.

## ORDER

Our opinions filed February 22, 2002, are hereby withdrawn, and new opinions—a lead opinion by Judge Fernandez, a concurring opinion by Judge McKeown, and a dissenting opinion by Judge Kleinfeld—are filed simultaneously herewith.

Judges Fernandez and McKeown voted to otherwise deny the petition for rehearing. Judge Kleinfeld would grant that petition. The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R.App. P. 35.

The petitions for rehearing and for rehearing en banc are, therefore, DENIED.

## OPINION

FERNANDEZ, Circuit Judge.

Eudene Eunique was denied a passport because she was severely in arrears on her child support payments. She brought an action for declaratory and injunctive relief on the theory that the statute and regulation authorizing that denial were unconstitutional. See 42 U.S.C. § 652(k); 22 C.F.R. § 51.70(a)(8). The district granted summary judgment against her, and she appealed. We affirm.

## BACKGROUND

When Eunique's marriage was dissolved, her husband was awarded custody [1] of the children, and she was ordered to pay child support. She failed to pay the ordered amounts, and by 1998 she was in arrears in an amount over $20,000. Thereafter, the arrearage continued to grow.[2] Despite the fact that she is unable or unwilling to pay her child support obligations, she desires to travel internationally for both business and pleasure, including visiting a sister in Mexico.[3]

Eunique applied for a passport, but by that time California had certified to the Secretary of Health and Human Services that she owed "arrearages of child support in an amount exceeding $5,000." 42 U.S.C. § 652(k). Congress has provided federal funds to help the states collect child support,[4] but has required that there be a state plan for child support which must include a "procedure for certifying to the Secretary ... determinations that individuals owe arrearages of child support in an amount exceeding $5,000." 42 U.S.C. § 654(31). There is no dispute that California has adopted a procedure and that it followed the procedure in this case.

The Secretary of Health and Human Services received that certification and was required by law to transmit it "to the Secretary of State for action." 42 U.S.C. § 652(k)(1). That was accomplished here. The law then directed that "[t]he Secretary of State shall, upon certification ..., refuse to issue a passport to" the individual in question. 42 U.S.C. § 652(k)(2). The regulations adopted by the Secretary of State provide that:

A passport, except for direct return to the United States, shall not be issued in any case in which the Secretary of State

1. Actually, he was designated as primary caretaker, although she and he had joint custody.

2. At oral argument, she indicated that the amount has reached $28,000–$30,000.

3. During the pendency of this appeal, by the way, she obtained a continuance in order to travel to Mexico to visit her sister. Apparently, she was able to enter Mexico without a passport.

4. See 42 U.S.C. §§ 651–669.

determines or is informed by competent authority that:

. . . .

The applicant has been certified by the Secretary of Health and Human Services as notified by a State agency under 42 U.S.C. 652(k) to be in arrears of child support in an amount exceeding $5,000.00.

22 C.F.R. § 51.70(a)(8). Thus, the regulation tracks the statutory language, and really adds nothing to it.

As a result of the statutory and regulatory requirements, Eunique was denied a passport. In her view, that denial was unconstitutional, so this action ensued. The district court ruled against her and she appeals.

## STANDARD OF REVIEW

"The constitutionality of a statute is a question of law which we review de novo. . . . A court should invalidate the statutory provision only for the most compelling constitutional reasons." *Gray v. First Winthrop Corp.*, 989 F.2d 1564, 1567 (9th Cir.1993) (citations and internal quotation marks omitted). We also review the grant of a summary judgment de novo. *Weiner v. San Diego County*, 210 F.3d 1025, 1028 (9th Cir.2000). "Summary judgment is proper if there are no questions of material fact and the moving party is entitled to judgment as a matter of law." *Western Chance # 2, Inc. v. KFC Corp.*, 957 F.2d 1538, 1540 (9th Cir.1992); *accord Harris v. Harris & Hart, Inc.*, 206 F.3d 838, 841 (9th Cir.2000).

## DISCUSSION

Eunique argues that there is an insufficient connection between her breach of the duty to pay for the support of her children, and the government's interference with her right to international travel. Thus, she argues, her constitutional rights have been violated. We disagree.

Eunique asserts that she has a constitutional right to international travel, which is so fundamental that it can be restricted for only the most important reasons, and by a narrowly tailored statute. It is undoubtedly true that there is a constitutional right to international travel. *See Kent v. Dulles,* 357 U.S. 116, 125, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1958). However, as the Supreme Court has said, "the right of international travel has been considered to be no more than an aspect of the liberty protected by the Due Process Clause of the Fifth Amendment. As such this right, the Court has held, can be regulated within the bounds of due process." *Haig v. Agee,* 453 U.S. 280, 307, 101 S.Ct. 2766, 2782, 69 L.Ed.2d 640 (1981) (citations and internal quotation marks omitted); *see also Zemel v. Rusk,* 381 U.S. 1, 14–15, 85 S.Ct. 1271, 1279–80, 14 L.Ed.2d 179 (1965); *Aptheker v. Sec'y of State,* 378 U.S. 500, 505, 84 S.Ct. 1659, 1663, 12 L.Ed.2d 992 (1964). In that respect, it differs from "[t]he constitutional right of interstate travel [which] is virtually unqualified." *Haig,* 453 U.S. at 307, 101 S.Ct. at 2782 (internal quotation marks and citations omitted). The difference means that we do not apply strict scrutiny to restrictions on international travel rights that do not implicate First Amendment concerns.

At an early point in the development of Supreme Court jurisprudence in this area, the Court seemed to suggest that restrictions upon travel must be looked upon with a jaded eye. *See Aptheker,* 378 U.S. at 507–514, 84 S.Ct. at 1664–68. However, it was then dealing with a law which touched on First Amendment concerns because it keyed on mere association. *Id.* at 507–08, 84 S.Ct. at 1664–65. The Court has not been as troubled in cases which do not directly involve those concerns. *See Haig,* 453 U.S. at 306–08, 101 S.Ct. at 2781–82; *Zemel,* 381 U.S. at 14–15, 85 S.Ct. at 1279–

80. Rather, as I see it, the Court has suggested that rational basis review should be applied.

When confronted with legislation which denied Supplemental Security Income benefits to people who were outside of the country, the Court commented that legislation which was said to infringe the right to international travel was "not to be judged by the same standard applied to laws that penalized the right to interstate travel." *Califano v. Aznavorian,* 439 U.S. 170, 177, 99 S.Ct. 471, 475, 58 L.Ed.2d 435 (1978). "It is enough," said the Court, "if the provision is rationally based." *Id.* at 178, 99 S.Ct. at 476. I recognize that because the SSI statute did not directly regulate passports, *Califano* is not directly applicable here, but it indicates that the Court does not apply the restrictive form of review advocated by Eunique. Moreover, the same theme appears in *Haig,* 453 U.S. at 307, 101 S.Ct. at 2782, where, again, the Court decided that regulation was appropriate "within the bounds of due process."

We have reified those Supreme Court emanations. In *Freedom to Travel Campaign v. Newcomb,* 82 F.3d 1431, 1439 (9th Cir.1996), we held that, "[g]iven the lesser importance of ... freedom to travel abroad, the Government need only advance a rational, or at most an important, reason for imposing the ban." The District of Columbia Circuit has read the Supreme Court tea leaves in the same way. As it has noted, "international travel is no more than an aspect of liberty that is subject to reasonable government regulation within the bounds of due process, whereas interstate travel is a fundamental right subject to a more exacting standard." *Hutchins v.*

*Dist. of Columbia,* 188 F.3d 531, 537 (D.C.Cir.1999).[5] Because, as I see it, rational basis review is the proper standard, the statute is constitutional if there is a " 'reasonable fit' between governmental purpose ... and the means chosen to advance that purpose." *Reno v. Flores,* 507 U.S. 292, 305, 113 S.Ct. 1439, 1449, 123 L.Ed.2d 1 (1993). Thus, we must presume § 652(k) to be valid, and we must uphold it "if it is rationally related to a legitimate government interest." *Rodriguez v. Cook,* 169 F.3d 1176, 1181 (9th Cir.1999).

■ The statute easily passes that test. There can be no doubt that the failure of parents to support their children is recognized by our society as a serious offense against morals and welfare. It "is in violation of important social duties [and is] subversive of good order." *Braunfeld v. Brown,* 366 U.S. 599, 603, 81 S.Ct. 1144, 1146, 6 L.Ed.2d 563 (1961). It is the very kind of problem that the legislature can address.

Moreover, the economic problems caused by parents who fail to provide support for their children are both well known and widespread. They can be exacerbated when the non-paying parent is out of the state, as, of course, a parent traveling internationally must be. Indeed, even within the United States itself, the problem is serious. That is one reason that we have upheld the constitutionality of the Child Support Recovery Act of 1992, 18 U.S.C. § 228, which actually criminalizes the failure of an out-of-state parent to pay child support, once having fallen as far behind as Eunique has. *See United States v. Mussari,* 95 F.3d 787, 790 (9th Cir.1996).[6]

---

**5.** I recognize that in *Causey v. Pan Am. World Airways (In re Aircrash in Bali, Indonesia on April 22, 1974),* 684 F.2d 1301, 1309–10 (9th Cir.1982), we indicated that international travel is a fundamental right. But that reference was dicta, was without citation to any

case that so stated, and the Supreme Court has surely suggested the contrary.

**6.** We have recently applied that statute again, though in a somewhat different context. *See United States v. Gill,* 264 F.3d 929, 931 (9th Cir.2001).

We did that, by the way, over objections that commerce was not involved, but that Congress was seeking to regulate a "fundamental familial relation." *Id.* So serious a problem was it, we were not deterred by the argument that family issues should be left to the states, but, rather, noted that:

> Respect for the competency of the states in matters of domestic relations is not disparaged but manifested when the states are confronted with interstate impediments to the fulfillment of domestic duties that the courts of the states have imposed, and the states find themselves, if not helpless, at least gravely impaired in pursuing the delinquent debts.

*Id.* at 791. That is true in this case also; international travel by what our society often calls "deadbeat parents" presents even more difficulties because the United States cannot easily reach them once they have left the country.

Congress also has financial concerns because unsupported children must often look to the public fisc, including the federal treasury, for financial sustenance. That was an impetus for the enactment with which we now deal; it is the reason that the Child Support Enforcement Program, 42 U.S.C. §§ 651–669, was enacted in the first place, and was quite properly upheld by the Tenth Circuit, despite attacks on various constitutional grounds, not including the ground that we consider here. *See Kansas v. United States,* 214 F.3d 1196, 1198, 1204 (10th Cir.), *cert. denied,* 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533 (2000).

All of this not only illustrates the rationality of Congress's goal, but also demonstrates its rational connection to the passport denial in question. Surely it makes sense to assure that those who do not pay their child support obligations remain within the country, where they can be reached by our processes in an at least relatively easy way. Notably, even when the Court iterated the constitutional right to travel in *Kent,* 357 U.S. at 127, 78 S.Ct. at 1119, it, without disapproval, took notice of a long-standing policy of denying passports to those who were "trying to escape the toils of the law" or "engaging in conduct which would violate the laws of the United States." A person who fails to pay child support may well attempt to escape the toils of the law by going abroad, and may even be violating the laws of the United States. *See, e.g.,* 18 U.S.C. § 228; *see also* Cal.Penal Code § 270.

Moreover, if a parent, like Eunique, truly wishes to partake of the joys and benefits of international travel, § 652(k) does have the effect of focusing that person's mind on a more important concern—the need to support one's children first. It doubtless encourages parents to do their duty to family. In short, the statute passes rational basis review with flying colors.[7] The Second Circuit, by the way, agrees with our conclusion. *Weinstein v. Albright,* 261 F.3d 127, 133 (2d Cir.2001).

## CONCLUSION

Eunique has failed to live up to a most basic civic and even moral responsibility: the provision of support to her own children. Yet she has brought this action because she feels that her right to the pleasures and benefits of international travel has been improperly curtailed. Un-

---

**7.** I recognize that in *Freedom to Travel,* 82 F.3d at 1439, we alluded to the possibility that passport restraints may require an "important" reason for imposing a travel ban. That sounds a good deal like what the Court has called "intermediate scrutiny." *See Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 220,

115 S.Ct. 2097, 2109, 132 L.Ed.2d 158 (1995). If so, all I have already said demonstrates that the restriction in question both fosters and is substantially related to an important governmental interest. Thus, Judge McKeown and I agree on the result.

fortunately for her, Congress has decreed that her duties to her children must take precedence over her international travel plans. It has ordered her priorities for her.

■ We hold that, without violating Eunique's Fifth Amendment freedom to travel internationally, Congress (and the State Department) can refuse to let her have a passport as long as she remains in substantial arrears on her child support obligations.[8] She is free to be a worker in the vineyards of the law, or to be a worker in another field, or, if she likes, to be a faniente, but the Constitution does not require that she be given a passport at this time.[9]

AFFIRMED.

McKEOWN, Circuit Judge, Concurring.

That the right to travel abroad is an important one is beyond dispute. The Supreme Court has not, however, declared international travel to be a fundamental right. Indeed, the Court has never mandated strict scrutiny review, but rather has pointedly distinguished between international travel and interstate travel. *Califano v. Aznavorian*, 439 U.S. 170, 176, 99 S.Ct. 471, 58 L.Ed.2d 435 (1978) (holding that interstate travel is "virtually unqualified" in contrast to international travel which is "no more than an aspect of the 'liberty' protected by the Due Process Clause"). As a consequence, considering the nature of the right to travel internationally, in my view intermediate scrutiny comes the closest to being the proper standard when First Amendment concerns are not implicated. Therefore, I concur in the result of Judge Fernandez's opinion because I conclude that the statute passes muster under intermediate scrutiny.

Securing the payment of child support for minor children is surely both an important and substantial government interest. Considering that enforcement often becomes illusory once the parent leaves the country, the passport restriction makes perfect sense. Significantly, the restriction is not absolute. Eunique, a lawyer, could simply pay the support. Doing so would not implicate any First Amendment or other fundamental right. Also, the procedure for state certification to the federal government of delinquent child support apparently permits waiver of the restriction for business purposes and family emergencies. Eunique has not even attempted to avail herself of the regulatory safe harbor.[1] Eunique's right to international travel, although protected under the Due Process clause, is not absolute. Accordingly, the restriction imposed here was carefully considered and should be upheld.

To understand the development of the jurisprudence in the travel arena, it is instructive to take a short chronological tour of the key Supreme Court cases and our circuit's follow-on cases. The seminal case of *Kent v. Dulles*, 357 U.S. 116, 117–18, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), considered regulations relating to the issuance of passports to Communists. The Court explained that "[t]he right to travel is part of the 'liberty' of which the citizen

8. *Again, I would do so because the statute and regulations pass rational basis scrutiny, and Judge McKeown would do so because they also pass intermediate scrutiny.*

9. On appeal, Eunique raises the new claim that Congress violated international law when it enacted § 652(k). We do not hear issues raised on appeal for the first time. *See Crawford v. Lungren*, 96 F.3d 380, 389 n. 6 (9th Cir.1996); *Broad v. Sealaska Corp.*, 85 F.3d 422, 430 (9th Cir.1996).

1. Although this safe harbor derives from state law, the federal statute is predicated on state certification of child support delinquency provided in accordance with federal law. 42 U.S.C. § 653(k); *see also* 22 C.F.R. § 51.70(8).

cannot be deprived without the due process of law under the Fifth Amendment." *Id.* at 125, 78 S.Ct. 1113. It went on to elaborate that "[t]ravel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values." *Id.* at 126, 78 S.Ct. 1113. In the end, however, the Court did not reach the constitutional question; instead, it decided the case based on the scope of the Secretary of State's regulatory authority. *Id.* at 129, 78 S.Ct. 1113.

The Court next addressed international travel in a challenge to section 6 of the Subversive Activities Control Act, which denied passports to Communists. *Aptheker v. Secretary of State,* 378 U.S. 500, 501, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964). Concluding that the Act was unconstitutional on its face because it swept "too widely and too indiscriminately across the liberty guaranteed in the Fifth Amendment" [2] and was not "narrowly drawn to prevent the supposed evil," *id.* at 514, 84 S.Ct. 1659, the Court pointed out that Congress had less drastic measures at its disposal to safeguard national security. *Id.* at 512–13, 84 S.Ct. 1659.

Just one year later, in *Zemel v. Rusk,* 381 U.S. 1, 16, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), the Court upheld the constitutionality of travel restrictions to Cuba because the regulations were "supported by the weightiest considerations of national security." Significantly, the Court distinguished *Kent* because it dealt with passport denial based on political beliefs or associations. *Id.* at 13, 85 S.Ct. 1271. Referring to *Kent,* the Court observed that "the fact that a liberty cannot be inhibited without due process of law does not mean that it can under no circumstances be inhibited." *Id.* at 14, 85 S.Ct. 1271.

More than ten years after *Zemel,* in *Aznavorian,* 439 U.S. at 171–72, 99 S.Ct. 471, the Court considered an aspect of a government benefits program that suspended payment to recipients who were absent from the United States for more than thirty days. The Court rejected Aznavorian's argument that the suspension of benefits impermissibly infringed her right to travel internationally and should be subject to heightened scrutiny. *Id.* at 172, 175, 99 S.Ct. 471. After discussing *Kent, Aptheker,* and *Zemel,* the Court observed that there were crucial differences between the right to interstate travel, which is "virtually unqualified," and international travel, which is "no more than an aspect of the 'liberty' protected by the Due Process Clause." *Id.* at 175–76, 99 S.Ct. 471. Concluding that the right to international travel could be regulated within the bounds of due process, the Court held that "legislation which is said to infringe on the freedom to travel abroad is not to be judged by the same standard applied to laws that penalize the right of interstate travel." *Id.* at 176–77, 99 S.Ct. 471. Ultimately, the Court upheld the provision,

**2.** In footnote 4, the Court noted that plaintiffs also argued that the statute was unconstitutional because it violated the First Amendment. Although the Court stated that it was unnecessary to reach the First Amendment argument, *id.* at 504 n. 4, 84 S.Ct. 1659, First Amendment considerations were central to the discussion. For example, in response to the government's suggestion that one could still obtain a passport by abandoning Communist party membership, the Court found that such an infringement on the First Amendment freedom of association right was impermissible. *Id.* at 507, 84 S.Ct. 1659. In assessing whether the legislation in question abridged the Fifth Amendment, the Court recognized "the danger of punishing a member of a Communist organization 'for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share.'" *Id.* at 512, 84 S.Ct. 1659 (citation omitted).

which had an "incidental effect on a protected liberty" and was "rationally based." *Id.* at 177–78, 99 S.Ct. 471.

Finally, the Supreme Court had occasion to tie these cases together in *Haig v. Agee,* 453 U.S. 280, 282, 310, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981), when it held that former CIA agent Philip Agee's passport could be revoked because his efforts to expose intelligence agents posed a threat to national security. Although Agee attempted to invoke the authority of *Kent,* the Court distinguished *Aptheker* and *Kent* on the grounds that those cases involved beliefs rather than conduct. *Id.* at 304–05, 101 S.Ct. 2766 ("The protection accorded beliefs standing alone is very different from the protection accorded conduct.").

As to Agee's freedom to travel argument, the Court acknowledged that a passport revocation "undeniably curtail[ed] travel." *Id.* at 306, 101 S.Ct. 2766. Nonetheless, "[t]he freedom to travel abroad ... is subordinate to national security and foreign policy consideration; as such, it is subject to reasonable government regulation." *Id.* The Court then quoted *Aznavorian* for the proposition that freedom to travel abroad is not protected to the same extent as freedom to travel within the U.S. *Id.*

Following the teachings of these cases, we have addressed international travel on two occasions. The issue was raised in *Causey v. Pan Am. World Airways, Inc. (In re Aircrash in Bali, Indonesia on April 22, 1974),* 684 F.2d 1301, 1309 (9th Cir.1982), in the context of the Warsaw Convention. The panel held that because the plaintiffs had a statutory remedy available under the Tucker Act, the case should be heard by the Court of Claims. *Id.* at 1310, 1316. Although the panel used the phrase "fundamental right" in referencing international travel, it stated that "[r]estrictions on international travel ... must be carefully tailored to serve a substantial and legitimate government interest." *Id.* at 1309. This approach is more appropriately characterized as something less than strict scrutiny and more akin to intermediate scrutiny. *See, e.g., Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (the restriction must "serve important governmental objectives and must be substantially related to achievement of those objectives.").

Following *Causey,* we decided *Freedom to Travel Campaign v. Newcomb,* 82 F.3d 1431 (9th Cir.1996). Although *Freedom to Travel* referenced the Supreme Court's jurisprudence in this area, it did not discuss the *Causey* decision. *Id.* at 1438–39. Commenting on travel restrictions to Cuba, we characterized the government's goal of restricting hard currency into Cuba as "important," "substantial," and even "vital." *Id.* at 1439. *Freedom to Travel* equivocates that the proper test is rational basis, or at most intermediate, scrutiny: "[g]iven the lesser importance of this freedom to travel abroad, the Government need only advance a rational, or at most an important, reason for [restricting international travel]." *Id.* But in using the terms "important" and "substantial" interest, it also mirrors *Causey's* language of a "substantial" reason, thus easily supporting an intermediate scrutiny standard.

Given the importance of international travel—particularly in a global economy and an interdependent world—but recognizing the Supreme Court's distinction between international and domestic travel, I conclude that intermediate scrutiny should be the benchmark. In his opinion, Judge Fernandez concludes that the regulation at issue passed both rational basis and intermediate scrutiny. Therefore, I concur in the result.

KLEINFELD, Circuit Judge, dissenting.

I respectfully dissent.

Judge Fernandez's opinion would hold that "rational basis review is the proper standard"[1] for testing restrictions on a person's right to leave the United States. The right to leave one's country is too important to be subject to abridgment on so permissive a standard. The practical effect of consigning the right to travel to this lowly category of constitutional protection is to grant Congress plenary power to restrict it. Judge McKeown's opinion would hold that "intermediate scrutiny should be the benchmark."[2] In my view, we are not at liberty to take either approach.

The Supreme Court laid down the principles that govern this case before it adopted the three pigeonholes now fashionable: rational basis, intermediate, and strict scrutiny. The holdings in the principal right to travel cases use the approach that dominated jurisprudence in the 1960s, when pigeonholes and drawing inferences based on the pigeonholes was considered a relic of earlier times. We must take these cases as they are. In this case, unlike those in which the Supreme Court has upheld restrictions on travel, the government has not offered a foreign policy or national security justification for the restriction, the government has not narrowly tailored the restriction to its purpose, and the apparent purpose of the restriction is to penalize past misconduct rather than to restrict travel as such. Thus the travel ban in this case is unconstitutional under controlling Supreme Court precedent. That Court can revise its approach if it so decides, but we can't.[3]

The right to leave is among the most important of all human rights. In the *Crito*, Socrates explains his decision to stay in prison and accept the death penalty—rather than accept his friends' arrangement of an escape—by the social contract formed when, though free to leave Athens with his property, he elected to stay and subject himself to its laws:

> [W]e further proclaim to any Athenian by the liberty which we allow him, that if he does not like us when he has become of age and has seen the ways of the city, and made our acquaintance, he may go where he pleases and take his goods with him.... But he who has experience of the manner in which we order justice and administer the state, and still remains, has entered into an implied contract that he will do as we command him.[4]

Magna Carta established that subjects had a right to leave the kingdom and return.[5] The exceptions to the right to travel abroad in Magna Carta were for "those imprisoned or out-lawed" and for "a short period in time of war,"[6] a public policy reason relating to national security.

1. Opinion at 974 (Fernandez, Circuit Judge)

2. Concurring Opinion at 978 (McKeown, Circuit Judge)

3. *See Agostini v. Felton,* 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that '[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.' ") (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)).

4. Plato, *Crito, in Plato: Selections* 46 (Raphael Demos, ed., Charles Scribner's Sons 1955).

5. Magna Carta, ch. 42, *in Samuel E. Thorne et al., The Great Charter* 129 (New American Library: Mentor Books, 1966).

6. *Id.*

The Supreme Court held in *Kent v. Dulles*[7] that the "right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment."[8] The Court held that curtailments of that right must be narrowly construed,[9] because the right to travel is so "deeply engrained" in Anglo–American constitutional history.[10] Judge McKeown's opinion dismisses *Kent,* noting that it ultimately held only that the State Department's ban on passports for Communists exceeded its statutory authority,[11] not that the ban was unconstitutional. But this ignores *why* the Court resolved the case on statutory grounds, which was to avoid deciding a serious constitutional question: "Where activities or enjoyment, natural and often necessary to the well-being of an American citizen, such as travel, are involved, we will construe narrowly all delegated powers that curtail or dilute them."[12] Congress has described the right to emigrate as fun"fundamental" in the Jackson–Vanik Amendment,[13] which pressures communist countries to let their people go:

> To assure the continued dedication of the United States to fundamental human rights . . . products from any nonmarket economy country shall not be eligible to receive nondiscriminatory treatment . . .

during the period beginning with the date on which the President determines that such country . . . denies its citizens the right or opportunity to emigrate.[14] In Europe in the 1930s and 1940s, for many citizens emigration or not meant life or death.

Ms. Eunique got caught by part of the "deadbeat dads" law,[15] and cannot get a passport, because she has not been paying her ex-husband the $175 per month per child in child support that she agreed to pay when she divorced him. She was then in law school and "had thought that all lawyers earned a lot of money," but "things have not turned out as I expected." She has earned negligible net income from her law practice. She says that a Peruvian American friend has invited her to go to Peru to meet relatives who have a law firm there, and has suggested that her trip "could open up opportunities for the law firm to hire me when they need legal work in California." Ms. Eunique is plainly derelict in her duty to pay child support, and was properly denied a passport, if the statute and regulation[16] are constitutional.

The Supreme Court has dealt with three kinds of interference with the right to travel abroad: bans on travel by specific classes of persons;[17] bans on travel to specific countries;[18] and residency re-

**7.** 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958).

**8.** *Id.* at 125, 78 S.Ct. 1113.

**9.** *Id.* at 129, 78 S.Ct. 1113.

**10.** *Id.* at 126, 78 S.Ct. 1113.

**11.** *Id.* at 129, 78 S.Ct. 1113.

**12.** *Id.,* 78 S.Ct. 1113

**13.** 19 U.S.C. § 2432(a) (1999).

**14.** *Id.  See also* 19 U.S.C. § 2439 (1999).

**15.** 42 U.S.C. § 652(k) (1998); 22 C.F.R. § 51.70(a)(8) (2001).

**16.** *Id.* § 652(k); 22 C.F.R. § 51.70(a)(8).

**17.** *See Kent,* 357 U.S. at 117–18, 78 S.Ct. 1113 (regulation denying passports to Communists); *Aptheker v. Secretary of State,* 378 U.S. 500, 501–502, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (statute denying passports to Communist Party members); *Haig v. Agee,* 453 U.S. 280, 281, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (regulation denying passports to persons whose activities abroad endanger national security or the foreign policy).

**18.** *Zemel v. Rusk,* 381 U.S. 1, 3–4, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) (regulation invalidating passports for travel to Cuba); *Regan v. Wald,* 468 U.S. 222, 224, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984) (regulation banning most economic transactions in connection with travel to Cuba).

quirements for government benefits that incidentally burden persons who travel abroad.[19] The Court has held that incidental burdens on permitted travel need only have a rational basis,[20] but has subjected restrictions on travel itself to much greater scrutiny.[21] The Court has not formally stated the constitutional test, but its elements are clear. Travel restrictions must be justified by an important or compelling government interest and must be narrowly tailored to that end.[22] Travel bans aimed at specific individuals or classes of individuals must be more narrowly tailored than bans aimed at specific countries.[23]

The statute and regulation in this case [24] impose a direct restriction on travel, rather than an incidental burden, and must meet a higher standard of scrutiny than rational basis. They do not restrict travel *to* a specific country or region for reasons of national security or foreign policy, as in *Zemel v. Rusk*[25] and *Regan v. Wald.*[26] Instead, they restrict travel by a specific class of people *from* their own country. The Supreme Court has upheld such restrictions when a person's activities threaten national security or foreign policy, as in *Haig v. Agee,*[27] and has suggested that bans on travel by people "participating in illegal conduct, trying to escape the toils of the law, promoting passport frauds, or otherwise engaging in conduct which would violate the laws of the United States" would also be proper.[28] Had Eunique been held in contempt and ordered to stay in the United States and purge it, she might be "trying to escape the toils of the law" by traveling abroad. But the statute and regulation in this case only require that she be a debtor,[29] not a fugitive, and so far as the record shows, that is all she is.

We should reverse the district court under *Aptheker v. Secretary of State.*[30] The statute in that case denied passports to members of the Communist Party.[31] The Communists lost in district court under rational basis review, but won in the Supreme Court because it applied a more stringent standard of review.[32] *Aptheker* cannot be distinguished on the ground that

**19.** *Califano v. Aznavorian,* 439 U.S. 170, 171–72, 99 S.Ct. 471, 58 L.Ed.2d 435 (1978) (statute denying Supplement Security Income benefits to persons outside of the United States for certain periods of time).

**20.** *Aznavorian,* 439 U.S. at 177–78, 99 S.Ct. 471.

**21.** *See Aptheker,* 378 U.S. at 514, 84 S.Ct. 1659; *Zemel,* 381 U.S. at 14–16, 85 S.Ct. 1271; *Agee,* 453 U.S. at 306–308, 101 S.Ct. 2766; *Wald,* 468 U.S. at 240–243, 104 S.Ct. 3026

**22.** *See Aptheker,* 378 U.S. at 514, 84 S.Ct. 1659 (quoting *Cantwell v. Connecticut,* 310 U.S. 296, 307, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)).

**23.** *Compare Aptheker* at 514, 84 S.Ct. 1659 (holding unconstitutional a travel restriction on Communist Party members) and *Agee,* 453 U.S. at 308, 101 S.Ct. 2766 (upholding a travel restriction on a former CIA agent who traveled abroad exposing CIA agents to hostile governments) to *Zemel,* 381 U.S. at 16, 85 S.Ct. 1271 (upholding restriction on travel to Cuba) and *Wald,* 468 U.S. at 242, 104 S.Ct. 3026 (same).

**24.** 42 U.S.C. § 652(k); 22 C.F.R. § 51.70(a)(8).

**25.** 381 U.S. at 16, 85 S.Ct. 1271.

**26.** 468 U.S. at 242, 104 S.Ct. 3026.

**27.** 453 U.S. at 308, 101 S.Ct. 2766.

**28.** *Id.* at 290, 101 S.Ct. 2766 (1981) (quoting *Kent,* 357 U.S. at 127, 78 S.Ct. 1113) (internal quotation marks omitted).

**29.** *See* 42 U.S.C. § 652(k); 22 C.F.R. § 51.70(a)(8).

**30.** 378 U.S. at 516, 84 S.Ct. 1659.

**31.** *Id.* at 501–502, 84 S.Ct. 1659.

**32.** *Id.* at 516, 84 S.Ct. 1659.

it is a First Amendment case, as the other two opinions would do, because the Court expressly held that its disposition of the case under the Fifth Amendment made it unnecessary to review the First Amendment contentions.[33] The Court held that the right to travel abroad is "an important aspect of the citizen's liberty guaranteed in the Due Process Clause . . . ,"[34] describing it as one of our "basic freedoms."[35] It therefore applied to the passport restriction the "familiar and basic principle" that "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms."[36] The "bare fact of organizational membership" in the Communist Party was too "tenuous" in its relationship to national security concerns to justify the breadth of the ban.[37] The total ban "indiscriminately" ignored such "plainly relevant" factors as "the individual's knowledge, activity, commitment, and purposes in and places for travel."[38] Accordingly, the Court held that the statute was "unconstitutional on its face" because it swept "too widely and too indiscriminately across the liberty guaranteed in the Fifth Amendment."[39]

Judge Fernandez's opinion tries to dilute *Aptheker* by characterizing it as quaint, from "an early point in the development of Supreme Court jurisprudence in this area."[40] It's binding. And 1964 is not so long ago as all that. A Court of Appeals is bound by Supreme Court decisions, even if it sees them as undermined by subsequent decisions.[41] *Aptheker* is the law and it controls this case.

The ban on passports for "deadbeat dads" (and "deadbeat moms" as in this case) is less constitutionally defensible than the ban on passports for Communists held unconstitutional in *Aptheker.* In *Aptheker,* there was a genuine national security concern, but the statute swept too broadly, embracing cases where that concern was highly attenuated. Since Magna Carta, national security concerns have justified limiting the right to travel outside the country. For parents in arrears on child support, there is no national security or foreign policy concern.

*Zemel v. Rusk* does not support the travel restriction in this case, because the restriction on travel to Cuba upheld there was based on the "weightiest considerations of national security."[42] Judge McKeown's opinion says that *Zemel* "distinguished *Kent* because it dealt with passport denial based on political beliefs or associations." That's not quite correct. *Zemel* distinguished *Kent* because *Kent* involved denial of a passport based on a "characteristic peculiar to appellant," but

---

33.  *Id.* at 504, n. 4, 84 S.Ct. 1659.

34.  *Id.* at 500, 84 S.Ct. 1659 (quoting *Kent v. Dulles,* 357 U.S. 116, 127, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958)) (internal quotation marks omitted).

35.  *Id.* at 514, 84 S.Ct. 1659.

36.  *Id.* at 508, 84 S.Ct. 1659.

37.  *Id.* at 514, 84 S.Ct. 1659.

38.  *Id.,* 84 S.Ct. 1659

39.  *Id.,* 84 S.Ct. 1659

40.  Opinion at 973 (Fernandez, Circuit Judge).

41.  *See Agostini,* 521 U.S. at 237, 117 S.Ct. 1997 ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.") (citation and internal quotation marks omitted).

42.  381 U.S. at 16, 85 S.Ct. 1271.

*Zemel* involved "foreign policy considerations affecting all citizens." Unlike *Kent*, *Zemel* did not uphold a prohibition on traveling *out* of the United States, just one on travel *to* a particular hostile country.[43] The case at bar is more like *Kent* than *Zemel:* the statute and regulation prohibit Ms. Eunique from traveling *out* of the United States based on her debtor status, a "characteristic peculiar" to her, rather than "foreign policy considerations affecting all citizens."

Nor does *Califano v. Aznavorian*[44] support the travel restriction in this case. The law in *Aznavorian* did not restrict travel at all. It just imposed an incidental burden on travelers by suspending their Supplemental Security Income payments while they freely traveled outside of the United States.[45] The Court in *Aznavorian* explicitly distinguished passport restrictions from the "rational basis" review it gave the suspension of government benefits while abroad, noting that the law at issue "does not limit the availability or validity of passports."[46]

*Haig v. Agee* is another national security case.[47] It upheld the application of a regulation narrowly tailored to "cases involving likelihood of 'serious damage' to national security or foreign policy ..." to a former CIA agent who betrayed undercover CIA agents working abroad to hostile governments.[48] *Regan v. Wald* is another travel-to-Cuba case, upholding that travel restriction (which allowed Americans freely to travel abroad, just not to that particular hostile country) because of "weighty concerns of foreign policy."[49] *Wald* upheld a narrowly tailored travel restriction that supported the government's important foreign policy and national security interests;[50] it did not recognize a "First Amendment exception" to an until-now non-existent rule of rational basis review for travel restrictions.

Our circuit precedents do not control this case. They sometimes speak of the right to travel as "fundamental,"[51] sometimes not,[52] and none uphold an across-the-board travel ban for other than foreign policy or national security reasons. *Freedom to Travel Campaign v. Newcomb* simply upheld a restriction on travel to a single country, Cuba[53]—a restriction already upheld by the Supreme Court in *Regan v. Wald*[54]—not on travel outside the United States. *Freedom to Travel* expressly avoids adopting a rational basis standard of review by saying "the government need only advance a rational, or at most important, reason...."[55]

The statute and regulations are more plainly overbroad here than in *Aptheker*. Judge Fernandez's opinion suggests that "it makes sense to assure that those who do not pay their child support obligations remain within the country."[56] But the

---

**43.** *Id.* at 3, 85 S.Ct. 1271.

**44.** 439 U.S. 170, 99 S.Ct. 471, 58 L.Ed.2d 435 (1978).

**45.** *Id.* at 171–72, 99 S.Ct. 471.

**46.** *Id.* at 177, 99 S.Ct. 471.

**47.** 453 U.S. at 307, 101 S.Ct. 2766.

**48.** *Id.* at 306–308, 101 S.Ct. 2766.

**49.** 468 U.S. at 242, 104 S.Ct. 3026.

**50.** *Id.* at 242–43, 104 S.Ct. 3026.

**51.** *In re Aircrash in Bali, Indonesia on April 22, 1974,* 684 F.2d 1301, 1309 (9th Cir.1982).

**52.** *Freedom to Travel Campaign v. Newcomb,* 82 F.3d 1431, 1439 (9th Cir.1996).

**53.** *Id.*

**54.** 468 U.S. at 244, 104 S.Ct. 3026.

**55.** 82 F.3d at 1439.

**56.** Plurality Opinion at 975.

statute and regulation do not do require people to remain within the country. Someone fleeing the country to avoid collection attempts may flee to Mexico, Canada, and a number of other countries without a passport.[57] This passport ban is more reasonably seen, in light of the penalties the states are required to impose for nonpayment of child support— "withhold[ing] or suspend[ing], or ... restrict[ing] the use of driver's licenses, professional and occupational licenses, and recreational and sporting licenses of individuals owing overdue support"[58]—not as a means of facilitating collection, but as a penalty for past nonpayment. After all, taking away a lawyer's or other licensed professional's license to practice makes her less able to pay her child support.

The passport ban is also overbroad because, as in *Aptheker*, it does not take into account individual reasons that might support a passport.[59] For example, travel abroad would, in some businesses (importing) and some lines of professional work, be necessary to earning the money with which the parent would be able to pay child support. And it does not allow for considerations that would bear on the risk of a person traveling abroad to evade child support obligations. Were it tailored to avoiding such flight, then posting of security, owning assets fixed in the United States, or having a job or business in the United States could be considered in determining whether to issue a passport, just as they would be in a bail application. Judge McKeown's opinion suggests that "the procedure for state certification to the federal government of delinquent child support apparently permits waiver of the restriction for business purposes and family emergencies"[60] and faults Ms. Eunique for not having "even attempted to avail herself of the regulatory safe harbor."[61] Judge McKeown's opinion refers to a procedure instituted by the California state agency responsible for child support collections, by which parents in arrears may, based on "extenuating circumstances," request removal from the delinquency list sent to the federal government and used to deny passports. This possible remedy is a creature of *state* law; it's irrelevant to whether the *federal* law at issue in this case is narrowly tailored.

If Ms. Eunique were a murderer who had done her time, she could get a passport.[62] But a person delinquent in paying child support is punished by denial of a passport. All debtors should pay their debts. Debts for child support have special moral force. But that does not justify tossing away a constitutional liberty so important that it has been a constant of Anglo–American law since Magna Carta, and of civilized thought since Plato. We should reverse.

There is a great deal of conduct that government requires or prohibits. Some is of overwhelming importance: you

---

57. Generally, a citizen may not "depart from or enter" the United States unless she "bears a valid United States passport," 8 U.S.C. § 1185(b) (1997), 22 C.F.R. § 53.1 (2001), but the President may specify exceptions, 8 U.S.C. § 1155. The main exception is for travel "between the United States and any country, territory, or island adjacent thereto in North, South, or Central America excluding Cuba ...," 22 C.F.R. § 53.2(b) (2001), with "United States" meaning any territory subject to the

United States' jurisdiction, 22 C.F.R. § 50.1(a) (2001).

58. 42 U.S.C. § 666(a)(16) (1998).

59. *See* 378 U.S. at 510–11, 84 S.Ct. 1659.

60. Concurring Opinion at 976 (McKeown, Circuit Judge).

61. *Id.* at 976.

62. *See* 22 C.F.R. §§ 51.70, 51.71 (2001).

shouldn't murder, steal, lie under oath. Some is of lesser importance, though still the result of considered policy choices: you should pay your debts, pay your taxes, refrain from speeding, refrain from smoking on airplanes. Violating any of these requirements justifies punishment.

But the right to leave one's country is a very important guarantor of freedom (and in some countries, of life). That right is too important to let the government take it away as punishment to advance a government policy just because it is important. You can't get a passport if you're in arrears on your taxes? If you were ever convicted of drunk driving? If you didn't obey a summons for jury service? That weighs our liberty too lightly. Yet the other two opinions would evidently allow that.

And in this case, the scheme says, "You can't go to Paris if you haven't paid your child support, but you can if all you did was commit murder." The scheme also says, "Even though you can't go to Paris, it's OK to go to Mexico or Canada," [63] though enforcement will be just as difficult there as in Paris. Thus the scheme upheld does not provide a carefully tailored means of enforcing important legal objectives, just an unrelated and ineffective burden on an arbitrarily selected subset of people who don't do what they're supposed to do. Our liberty matters too much for that.