FILED
United States Court of Appeals
Tenth Circuit

July 20, 2021

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JEFFREY T. MAEHR,

     Plaintiff - Appellant,

v.

No. 20-1124

UNITED STATES DEPARTMENT OF
STATE, including Secretary of State
Antony Blinken[*], in his official capacity,

     Defendant - Appellee.
_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:18-CV-02948-PAB-NRN)**
_____

Bennett L. Cohen (Sean R. Gallagher and Megan E. Harry with him on the briefs),
Polsinelli PC, Denver, CO, for Plaintiff - Appellant.

Kathleen E. Lyon, Attorney (Richard E. Zuckerman, Principal Deputy Assistant Attorney
General, Joshua Wu, Deputy Assistant Attorney General, Francesca Ugolini, Attorney,
Arthur T. Catterall, Attorney, and Jason R. Dunn, United States Attorney with her on the
brief), Tax Division, U.S. Department of Justice, Washington, D.C., for Defendant -
Appellee.

_____

_____

[*] * Pursuant to Fed. R. App. P. 43(c)(2) Mike Pompeo is replaced by Antony Blinken as
appellee in this case.

_____

Before **MATHESON**, Circuit Judge, **LUCERO**, Senior Circuit Judge, and **PHILLIPS**, Circuit Judge.

_____

**PER CURIAM**

In this appeal, we affirm the judgment of the district court. This disposition is addressed in two opinions: one by Judge Lucero, and one by Judge Matheson.

Parts I, II, and III of Judge Lucero's opinion constitute the unanimous opinion of the court. Part I provides relevant background. Part II concludes the district court had subject-matter jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702. Part III rejects Mr. Maehr's arguments concerning the Privileges and Immunities clauses and the common law principle of *ne exeat republica*.

Judge Matheson's opinion, joined by Judge Phillips, is the majority opinion on Mr. Maehr's substantive due process challenge. On this issue, Judge Lucero concurs in the judgment in Part IV of his opinion.

**LUCERO**, Senior Circuit Judge.

Six years ago, the federal government instituted a new approach to encourage delinquent taxpayers to pay up: threaten to withhold or revoke their passports until their tax delinquency is resolved. No nexus between international travel and the tax delinquency needs be shown; the passport revocation serves only to incentivize

2

repayment of the tax debt. We are the first circuit to review the constitutionality of this approach.

Appellant Jeffrey T. Maehr is one of the Americans caught in the snares of this scheme. He challenged the lawfulness of the United States Department of State's revocation of his passport, arguing that it violates substantive due process, runs afoul of principles announced in the Privileges and Immunities clauses,[1] and contradicts caselaw concerning the common law principle of ne exeat republica. The district court rejected all three of his challenges. We affirm the district court on each of these arguments.

## I

In 2015, Congress passed and the President signed into law the Fixing America's Surface Transportation Act ("FAST Act"), Pub. L. 114-94, 129 Stat. 1312 (2015), an omnibus transportation bill that included a provision permitting the denial or revocation of passports for taxpayers with significant tax debts. Under the FAST Act, if a taxpayer is subject to a delinquent federal tax debt of $50,000[2] or more, the IRS may certify the delinquency to the Secretary of the Treasury, who in turn transmits the certification to the Secretary of State. I.R.C. § 7345. The Secretary of State is thereafter prohibited from issuing a new passport to the taxpayer and is authorized, though not required, to revoke a

---

[1] Maehr finds support for this theory in both the Privileges and Immunities Clause of Article IV, Section 2 and the Privileges or Immunities Clause of the Fourteenth Amendment. We refer to them collectively as "the Privileges and Immunities clauses."

[2] This amount is adjusted for inflation beginning in 2016.

previously issued passport.[3]  22 U.S.C. § 2714a(e)(1), (2).  These consequences remain with the taxpayer until any of several circumstances occur, such as full satisfaction of the tax debt, entry into an installment agreement with the IRS, or a finding that the original certification was erroneous.  I.R.C. § 7345(c).

The scheme's rationale appears to have been simply to use the threat of passport revocation as an incentive for tax compliance.  No direct connection between tax delinquency and international travel, such as evidence the delinquent taxpayer is secreting assets overseas, is required to effect a passport revocation.  Review of the legislative history also yields no evidence that passport revocation was aimed at, for example, thwarting delinquent taxpayers from fleeing the country or evading tax collection.  See Michael S. Kirsch, Conditioning Citizenship Benefits on Satisfying Citizenship Obligations, 2019 U. Ill. L. Rev. 1701, 1712 (2019) ("[T]he GAO Report, upon which the FAST Act limitations are based, did not explicitly mention [an anti-fleeing rationale], focusing instead on the tax compliance incentives associated with the passport limitations.").  Rather, a straightforward incentive mechanism—making tax delinquency more painful by inhibiting one's ability to enter or exit the country— explained why the Senate Finance Committee "believe[d] that tax compliance [would]

---

[3] For ease of reference, we will refer to both the denial of new passports and the revocation of passports previously issued as "revocation."

increase if issuance of a passport is linked to payment of one's tax debts."  S. Rep. No. 114-45, 57 (2015).

Passport revocation under the FAST Act is thus an example of a species of tax penalties known as collateral sanctions.  "Unlike traditional tax penalties that require noncompliant taxpayers to pay money to the taxing authority, collateral tax sanctions require noncompliant taxpayers to forfeit a nonmonetary government benefit or service." Joshua D. Blank, Collateral Compliance, 162 U. Pa. L. Rev. 719, 728 (2014).  They "increasingly apply to individuals who have failed to obey the tax law," perhaps because they "can promote voluntary tax compliance more effectively than the threat of additional monetary tax penalties."  Id. at 720.  States and the federal government impose a variety of collateral tax sanctions, ranging from diminished housing assistance to the cancelling of driver's licenses.  Id. at 739-40.  Passport revocation had not been used to thwart tax delinquency until the FAST Act, but it has been used in the context of non-payment of child support.  See 42 U.S.C. § 652(k).

Appellant Jeffrey T. Maehr is among the many[4] Americans whose tax delinquency rendered him subject to passport revocation under the FAST Act.  Despite a number of

---

[4] According to the IRS, some 436,400 taxpayers qualified for passport revocation under § 7345 as of April 2018.  Nat'l Taxpayer Advocate, Objectives Report to Congress, FY 2019, vol. 1, at 80.

challenges to a 2011 IRS tax assessment,[5] Maehr owes approximately $250,000 in taxes. In 2018, the IRS certified Maehr's tax delinquency, and the State Department subsequently revoked Maehr's passport. Maehr then filed a complaint challenging the authority of the Department of State to revoke passports on the basis of tax debts.[6]

The district court granted the Department of State's motion to dismiss for failure to state a claim. It concluded that it would have subject-matter jurisdiction on the basis of the writ of mandamus if, and only if, the Department of State acted unconstitutionally in revoking Maehr's passport. Because the district court held that passport revocation under the FAST Act is supported by a rational basis and not otherwise unconstitutional, it dismissed Maehr's claim for want of jurisdiction. This appeal followed.

## II

After spilling a great deal of ink thrashing out the issues of subject-matter jurisdiction and sovereign immunity before the district court, the parties appear to have settled on a mutually satisfactory resolution. Both Maehr and the Department of State now identify 28 U.S.C. § 1331 as a basis for the district court's subject-matter

---

[5] See, e.g., Maehr v. Comm'r of Internal Revenue, 480 F. App'x 921 (10th Cir. 2012); Maehr v. United States, 767 F. App'x 914 (Fed. Cir. 2019). Though he continues to dispute his tax assessment, Maehr stipulates for purposes of this appeal that he owes the amount in question to the IRS.

[6] Due to a suggestion made by the presiding magistrate judge, pro bono counsel agreed to represent Maehr in this case of first impression. We thank the pro bono counsel for their help with this matter.

jurisdiction and 5 U.S.C. § 702 of the Administrative Procedure Act (APA) as an applicable waiver of sovereign immunity.  We conclude the same.

Because Maehr seeks an injunction ordering the Department of State to return his passport, we are asked to "exercise[] [our] traditional powers of equity . . . to prevent violations of constitutional rights."  Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225, 1231 (10th Cir. 2005).  These powers flow from the long-recognized "jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution."  Bell v. Hood, 327 U.S. 678, 684 (1946).  "Bell v. Hood held that suits for relief directly under the Constitution fall within [the] grant of jurisdiction" provided by § 1331.  Simmat, 413 F.3d at 1232.  "Section 1331 thus provides jurisdiction for the exercise of the traditional powers of equity in actions arising under federal law."  Id.  The district court therefore had jurisdiction under § 1331, and we have appellate jurisdiction under 28 U.S.C. § 1291.

Sovereign immunity is no bar to our or the district court's exercise of jurisdiction. Section 702 of the APA waives sovereign immunity for actions "stating a claim that an agency . . . acted or failed to act . . . under color of legal authority."  "This waiver is not limited to suits under the Administrative Procedure Act."  Simmat, 413 F.3d at 1233.  It is therefore applicable to a claim that the Department of State acted unconstitutionally by

revoking Maehr's passport.[7]  Consequently, the district court was free to exercise the jurisdiction conveyed by § 1331.

Without the benefit of briefing from either party on the applicability of § 702, the district court was left to determine whether jurisdiction and waiver of sovereign immunity was properly founded on a theory of mandamus, see 28 U.S.C. § 1361, or on the judicial review created by passport revocation itself, see § 7345.  Our resolution of jurisdiction and sovereign immunity on the basis of § 1331 and § 702, respectively, obviates any need to consider that debate.  We turn to the merits.

### III

The opinion of the court is unanimous as to two of the arguments raised by Mr. Maehr.  The first concerns the Privileges and Immunities clauses; the second relies on the common law principle of ne exeat republica.  Each will be addressed in turn.

### A

Maehr contends that the Privileges and Immunities Clause of Article IV, Section 2 and the Privileges or Immunities Clause of the Fourteenth Amendment encompass the right to international travel and thereby limit the federal government's ability to restrict

---

[7] While § 702 does not appear to have been briefed to the district court by either party as a means of avoiding sovereign immunity, there is no issue with regards to forfeiture of the argument.  "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 434 (2011).

such travel. His argument is implausible. These clauses apply to states, not the federal government, and Maehr can articulate no way around this fact. Even if the clauses could somehow constrain the federal government, no Supreme Court decision has ever interpreted these clauses as at all relevant to a right to international travel.

As even Maehr admits, the Privileges and Immunities clauses apply only to the states, not to the federal government. Maehr is right to so concede because the limited applicability of the clauses to states is well-settled. See Slaughter-House Cases, 83 U.S. 36, 77 (1872) ("[The Privileges and Immunity Clause's] sole purpose was to declare to the several States, that whatever those rights, as you grant or establish them to your own citizens . . . the same . . . shall be the measure of the rights of citizens of other States within your jurisdiction."); Pollack v. Duff, 793 F.3d 34, 41 (D.C. Cir. 2015) (collecting cases). Because this case concerns a federal statute enforced by federal actors, the clauses are of no relevance.

To evade this unavoidable conclusion, Maehr asks us to make a leap: we should consider the Privileges and Immunities clauses "reverse incorporated" against the federal government. For this proposition he cites Bolling v. Sharpe, 347 U.S. 497 (1954) and its progeny, which held that the federal government's duty to avoid segregation and other racial classifications cannot be any less stringent than that of the states. Yet these cases addressed only racial discrimination; they were not written so broadly as to encompass all "constitutional civil rights protections," as Maehr claims. They were also rooted in different constitutional provisions and a significantly different context. "[T]he central

9

purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources . . . ." McLaughlin v. Florida, 379 U.S. 184, 185 (1964). Bolling's reverse incorporation was necessary to avoid the "unthinkable" result that the District of Columbia could continue its policy of school segregation in the wake of Brown v. Board of Education merely because it fell under the federal government's umbrella. 347 U.S. at 500. In contrast, reverse incorporation of the Privileges and Immunities clauses would be not only novel but also devoid of any support from the clauses' text or context.

Even if the Privileges and Immunities clauses applied to the federal government, they would be of no import in this case because the right to international travel is not a privilege or immunity encompassed by the clauses. Maehr is correct that the scope of these clauses, as limited by the Slaughter-House Cases, does include the "right to travel." See Zobel v. Williams, 457 U.S. 55, 78-81 (1982) (O'Connor, J., concurring). But that right to travel has always been interpreted to mean interstate travel, never international travel—an unsurprising fact given the clauses' limited application to states, which lack any role in the regulation of international travel. The entirety of Maehr's argument to the contrary appears to be that in Saenz v. Roe, 526 U.S. 489 (1999), the Court referred to "the right to travel" as a privilege of citizenship without explicitly differentiating between interstate and international travel, and defined this right in broad terms as "the right to go from one place to another." Id. at 500. But just two pages earlier, the Court mentioned that the constitutional right in question was the "right to travel from one state to another." Id. at 498 (quotation omitted). This makes sense: the case was about a California statute

10

that limited the welfare benefits available to out-of-state citizens who had recently moved to California. Maehr does not provide any further explanation of how he finds a right to international travel in the text or caselaw of the Privileges and Immunities clauses.

The Privileges and Immunities clauses do not apply to the federal government and do not protect any right to international travel. For either of these reasons, the district court was correct to reject the argument.

**B**

The writ of ne exeat republica is "a form of injunctive relief ordering the person to whom it is addressed not to leave the jurisdiction of the court or the state." United States v. Barrett, 2014 WL 321141, *1 (D. Colo. Jan. 29, 2014). It is essentially "a form of civil arrest" that can be used to confine a person to the country, a particular jurisdiction, or even his house. Aetna Cas. & Sur. Co. v. Markarian, 114 F.3d 346, 349 (1st Cir. 1997). The Internal Revenue Code permits its use to enforce tax obligations. I.R.C. § 7402. Our circuit has never announced a standard for the issuance of ne exeat writs, but other courts have invoked the four-factor test for preliminary injunctions. See, e.g., Barrett, 2014 WL 321141, at *7.

Maehr contends that a similar standard should apply to passport revocation under the FAST Act given that scheme's similar purpose to ne exeat writs issued under I.R.C. § 7402. He cites United States v. Shaheen, 445 F.2d 6 (7th Cir. 1971), which vacated a ne exeat writ issued against a delinquent taxpayer that barred him from leaving the jurisdiction because he intended to depart the United States. The court, after noting that

11

the right of international travel is constitutionally protected, explained that when "relief impinges upon a constitutionally protected personal liberty, . . . the Government has the burden of demonstrating that [it] is a necessary, and not merely coercive and convenient, method of enforcement." Id. at 10–11. Maehr urges that a similar burden should apply to passport revocation under the FAST Act.

Writs of ne exeat differ significantly from FAST Act passport revocations in three ways. First, the scope of ne exeat is much broader, restricting freedom of movement domestically as well as internationally. Second, writs of ne exeat can be issued even if the underlying tax debt is contested by the taxpayer, see, e.g., Shaheen, 445 F.2d at 10, whereas the FAST Act requires that the taxpayer's rights to challenge a contested liability have lapsed or been exhausted prior to passport revocation. I.R.C. § 7345(c). Third, ne exeat is an essentially equitable common law remedy that has been codified in statute, making it sensible that courts have required showings of evidence paralleling those required for preliminary injunctions. Passport revocation under the FAST Act, in contrast, is a purely statutory and legal scheme with built-in due process protections.

Ne exeat is readily distinguishable from passport revocation under the FAST Act. The caselaw governing ne exeat is therefore inapplicable to this case. We affirm the district court's rejection of this argument.

IV

Maehr contends that the revocation of his passport based on his tax delinquency amounted to an infringement of his right to international travel in violation of substantive

12

due process. I ultimately agree with my colleagues that Maehr inadequately briefed the issue to permit the resolution that I conclude the law otherwise requires. Because of the importance of the right at stake, I write this part separately to provide an analysis of the intersection of substantive due process and the right of international travel.

"[A]djudication of substantive due process claims may call upon the Court in interpreting the Constitution to exercise that same capacity which by tradition courts always have exercised: reasoned judgment. Its boundaries are not susceptible of expression as a simple rule." Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 849 (1992). Substantive due process "has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society." Id. at 850 (quoting Poe v. Ullman, 367 U.S. 497, 542 (1961) (Harlan, J., dissenting)). "This 'liberty' is not a series of isolated points," but rather a "rational continuum" that recognizes "that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment." Poe, 367 U.S. at 543 (Harlan, J., dissenting).

Ordinarily, this continuum collapses into two poles. If a liberty interest protected by the Due Process Clause is deemed fundamental, it is reviewed under strict scrutiny, meaning any infringement must be "narrowly tailored to serve a compelling state interest." Reno v. Flores, 507 U.S. 292, 302 (1993). A liberty interest less than fundamental generally receives rational basis review, which demands only that a governmental infringement on the interest "be rationally related to legitimate government

interests." Washington v. Glucksberg, 521 U.S. 702, 728 (1997); see also Dias v. City and Cty. of Denver, 567 F.3d 1169, 1181 (10th Cir. 2009).

I would not lightly step away from the default options governing substantive due process claims, but neither would doing so blaze an entirely new trail. There are significant exceptions in Supreme Court caselaw to the typical framework for substantive due process claims. Perhaps the most notable emerges from abortion caselaw, in which the Supreme Court has fashioned an "undue burden" standard that breaks from both strict scrutiny and rational basis. See Casey, 505 U.S. at 874 (1992). The Court explained that such a standard is an "appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty." Id. at 876. Similarly, in Obergefell v. Hodges, the Court held that the right to marry is fundamental but struck down laws that barred same-sex couples from exercising this right without applying strict scrutiny. 576 U.S. 644, 675-76 (2015). Though the default, the two-tiered approach to substantive due process claims is not rigidly adhered to by the Supreme Court.

In order to determine the appropriate level of scrutiny to use in evaluating a substantial infringement on international travel, I am guided by several sources and authorities. I proceed with "careful respect for the teachings of history" and "solid recognition of the basic values that underlie our society." Moore v. City of East Cleveland, 431 U.S. 494, 503 (1977) (quotation omitted). "History and tradition guide and discipline" the inquiry. Obergefell, 576 U.S. at 664. And although my research

14

leads me to no authority that squarely controls the outcome of this inquiry, I look to Supreme Court precedent that speaks to the question at issue.

## A

That the right to international travel is deeply woven into our history and tradition is hard to deny. The Magna Carta established that it "shall be lawful for any man to leave and return to our kingdom unharmed and without fear, by land or water, preserving his allegiance to us, except in time of war, for some short period, for the common benefit of the realm." 1215 Magna Carta, Section 42. Similar notions appear in Blackstone: "By the common law, every man may go out of the realm for whatever cause he pleaseth, without obtaining the king's leave . . . ." Sir William Blackstone, Commentaries on the Laws of England, Book I, Ch. 7 at 265.[8] The colonists carried this tradition forward by citing British restraints on movement both between the colonies and beyond as causes for the Revolutionary War. See Kahn, International Travel at 285-86.

Nor did the American commitment to freedom of movement abate after its founding. Movement between the United States and Canada, for example, was both commonplace and protected by treaty. See Treaty of Amity, Commerce and Navigation (Jay Treaty), Eng.-U.S., art. III, Nov. 19, 1794, 8 Stat. 116, 117. "[F]reedom of travel was in the nineteenth century a dominant theme in our foreign policy." Charles E.

---

[8] I note, however, that this right "waxes and wanes over the course of English legal history." Jeffrey Kahn, International Travel and the Constitution, 56 UCLA L. Rev. 271, 339 n.371 (2008).

15

Wyzanski, Jr., "Freedom to Travel," <u>Atlantic Monthly</u> 67 (Oct. 4, 1952).  As Nathaniel Hawthorne wrote while serving as American consul to Liverpool in the 1850s, "Sitting . . . in the gateway between the Old World and the New, where the steamers and packets landed the great part of our wandering countrymen, and received them again when their wanderings were done, I saw that no people on earth have such vagabond habits as ours." <u>Our Old Home:  A Series of English Sketches</u> (1863).  Hawthorne was not alone in enshrining travel as a distinctly American characteristic.  "The American is a migratory animal.  He walks the streets of London, Paris, St. Petersburg, Berlin, Vienna, Naples, Rome, Constantinople, Canton, and even the causeways of Japan, with as confident a step as he treads the pavements of Broadway."  Robert Tomes, "The Americans on Their Travels," <u>Harper's New Monthly Magazine</u> 31 (1865).  In both law and the popular imagination, international travel was accorded special import.

Only in the twentieth century did the American federal government begin imposing significant regulations on international travel.  <u>See</u> Kahn, <u>International Travel</u> at 313-17.  Even then, supporters of these regulations made clear that they conceived of their efforts as in harmony with the Anglo-American tradition of protecting the right of international travel.  For example, when the Deputy Under Secretary of State testified before the Senate Committee on Foreign Relations regarding proposed watershed passport legislation, he explained, "I find nothing in the legislation which the administration has proposed on this subject in contradiction to the principles stated in the Magna Carta.  The policy of our Government is to promote the travel of its

16

citizens. . . . However, as recognized in the Magna Carta the State has an obligation for the common good to exercise some controls over passports in times of war and national emergency." Passport Legislation: Hearing on S. 2770, S. 3998, S. 4110, and S. 4137 Before the S. Comm. on Foreign Relations, 85th Cong. 19 (1958) (statement of Robert D. Murphy, Deputy Under Secretary of State, Dep't of State). Thus even as the federal government expanded its control over international travel, it did so in recognition of the American tradition with which its efforts were in tension and argued that its limitations fit within the narrow historic exceptions to unfettered travel. Tax compliance incentives were certainly not of a piece with those exceptions.

At a more fundamental level, the right to international travel seems to me a prerequisite for the freedom guaranteed by the Constitution. It is true that a large percentage of Americans manage to live substantially free lives without ever traveling internationally.[9] Indeed, in our culture, international travel is often viewed as more of a luxury than a right, much less a bedrock right undergirding our nation's ordered liberty. That said, freedom to leave one's country and explore the world beyond national borders strikes me as a deep and fundamental component of human liberty. It is for good reason that such freedom has been called "a natural right," Shachtman v. Dulles, 225 F.2d 938,

---

[9] A recent survey found that 40% of Americans had never left the United States. John Bowden, Survey: 11 Percent of Americans Have Not Traveled Outside Home State, The Hill (May 3, 2019), https://thehill.com/policy/transportation/441989-11-percent-of-americans-have-not-traveled-outside-their-state-survey.

941 (D.C. Cir. 1955) and "a necessary attribute of democratic society," Leonard B. Boudin, The Constitutional Right to Travel, 56 Colum. L. Rev. 47, 49 (1956). To permit the government power to deny its citizens access to the outside world without a strong reason to do so seems inimical to the liberty that is every American's birthright. Further, if I imagine America in the absence of the right, with the citizenry entirely deprived of the right of international travel and the borders closed to all, it would be impossible to consider our country truly free. These considerations lead me to conclude that the right to international travel is implicit in the basic liberty protected by due process.

Moreover, the right to travel internationally is all but indispensable for the exercise of another long-established right: the right of expatriation, or the right to quit one's country and renounce one's citizenship. In 1868, Congress enacted legislation to protect this right, declaring, "[T]he right to expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness . . . ." Act of July 27, 1868, 15 Stat. 223. It therefore "declared inconsistent with the fundamental principles of this government" any governmental action that "denies, restricts, impairs, or questions the right of expatriation." Id. at 224; see also Mackenzie v. Hare, 239 U.S. 299, 309 (1915) ("In 1868 Congress explicitly declared the right of expatriation to have been and to be the law."). Expatriation is contingent on exit. If the right of expatriation is deeply woven into our country's history, so too is the concomitant right to travel beyond our borders.

18

In light of the "history and tradition [that] guide and discipline" the inquiry, Obergefell, 576 U.S. at 664, there is strong reason to conclude that the right of international travel cannot be substantially limited without passing muster under some form of heightened scrutiny.

**B**

History and tradition establish the importance of the right to international travel, importance which suggests heightened scrutiny of incursions on that right. Supreme Court precedent bolsters that suggestion.

Two cases illustrate the importance the Court has ascribed to international travel. In similar cases, the Supreme Court twice struck down the State Department's denials of passports to Communists on the basis of their political affiliations. Kent v. Dulles, 357 U.S. 116 (1958); Aptheker v. Sec'y of State, 378 U.S. 500 (1964). Though these cases implicated First Amendment protections as well as the right to international travel, the Court's analysis was not circumscribed by that context; its reasoning repeatedly highlighted the importance of the right to international travel.

Kent, a case concerning the denial of passports to Americans on the basis of their alleged Communist beliefs, 357 U.S. at 117-19, emphasized history and tradition in its evaluation of international travel: "Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage." 357 U.S. at 126. This heritage suggested the profound import of freedom of movement both within and across borders, which "may be as close to the heart of the individual as the choice of what he

19

eats, or wears, or reads. Freedom of movement is basic in our scheme of values." Id.

While the Court in Kent declined to decide the case on the basis of the constitutional

protections afforded the right to international travel, relying instead on statutory grounds,

it indicated that by doing so, it avoided "important constitutional questions." Id. at 130.

This dictum hinted at the heightened review that the Court would later bring to bear when

the constitutional question was squarely presented.

Six years after Kent was decided, the Court turned to the constitutional dimensions

of the right to international travel in Aptheker. In Aptheker, the Court considered the

constitutionality of a statute that made it a crime for a member of a Communist

organization to attempt to use or obtain a passport. 378 U.S. at 507. The Court

determined that statutes that impose substantial restrictions on the right to international

travel were to be evaluated under the following standard: "Even though the

governmental purpose be legitimate and substantial, that purpose cannot be pursued by

means that broadly stifle fundamental personal liberties when the end can be more

narrowly achieved."[10] Id. at 508 (quotation omitted). In more ways than one, the statute

---

[10] The context for this statement makes clear that the "fundamental personal libert[y]" at issue was the right to international travel rather than any First Amendment right. Preceding that statement was this: "Although previous cases have not involved the constitutionality of statutory restrictions upon the right to travel abroad, there are well-established principles by which to test whether the restrictions here imposed are consistent with the liberty guaranteed in the Fifth Amendment." Id. at 507-08. There is no indication from this context that the Court viewed the standard it announced as contingent on travel restrictions also burdening First Amendment rights.

20

enacted by Congress did not achieve its end by way of narrow means. See id. at 512-14. "The prohibition against travel is supported only by a tenuous relationship between" means and ends, and "[t]he broad and enveloping prohibition indiscriminately excludes plainly relevant considerations." Id. at 514. Moreover, Congress had "within its power less drastic means of achieving the congressional objective." Id. at 512 (quotation and footnote omitted). The statute was therefore "unconstitutional on its face." Id. at 514.

From these two cases, I discern several features of the standard to be applied to international travel limitations. When such a limitation is substantial, it is not automatically justified by virtue of its underlying governmental purpose being "legitimate," or even "substantial." Id. at 508 (quotation omitted). The limitation must also be tailored. Aptheker identifies a number of considerations that bear on whether a limitation is sufficiently tailored, including how "broadly" a liberty interest is "stifle[d]," whether "less drastic means of achieving" the governmental purpose were available, and whether the limitation "indiscriminately excludes plainly relevant considerations." Id. at 508, 512, 514 (quotation omitted).

---

My colleagues note that dictum from a later Supreme Court case, Regan v. Wald, 468 U.S. 222 (1984), described the First Amendment interests at stake in Kent and Aptheker as "controll[ing]." Id. at 241. We are indeed free to consider, though need not be controlled by, subsequent Court "elaboration" of its earlier cases. See Indep. Inst. v. Williams, 812 F.3d 787, 793 (10th Cir. 2016). But contradictory dictum is not elaboration: That characterization is belied by the reasoning actually employed in those cases. The Supreme Court has nowhere indicated that it no longer considers Kent and Aptheker good law. It therefore remains binding precedent.

21

Subsequent Supreme Court decisions concerning international travel have not undermined the force of Kent and Aptheker. I consider three in detail: Zemel v. Rusk, 381 U.S. 1 (1965); Califano v. Aznavorian, 439 U.S. 170 (1978); and Haig v. Agee, 453 U.S. 280 (1981).

Zemel addressed location-specific international travel restrictions made in light of national security concerns. In Zemel, the Court upheld the Department of State's prohibition on travel to or within Cuba without specific authorization, a prohibition issued in the immediate aftermath of the Cuban missile crisis. 381 U.S. at 3, 16. After citing Kent and Aptheker for the protection afforded travel by the Due Process Clause, the Court explained that "the fact that a liberty cannot be inhibited without due process of law does not mean that it can under no circumstances be inhibited." Id. at 14. "The requirements of due process are a function not only of the extent of the governmental restriction imposed, but also of the extent of the necessity for the restriction." Id. (footnote omitted). The need to limit travel to Cuba in the early days of the Castro regime was, in the view of the Court, severe: "[T]he restriction which is challenged in this case is supported by the weightiest considerations of national security . . . ." Id. at 16. Those "weightiest considerations" sufficed to justify the Cuba-specific restrictions on international travel. Id.

Aznavorian concerned incidental burdens on international travel. The Aznavorian Court upheld a statute that conditioned Supplemental Security Income benefits on the beneficiary's presence within the United States against a claim that the statute violated

22

the right to international travel. 439 U.S. at 171, 175. Significantly, the Court distinguished the case before it from Kent, Aptheker, and Zemel because the statute in question did not have "nearly so direct an impact on the freedom to travel internationally as occurred in" those three cases. Id. at 177. Had the Court been reviewing Kent and Aptheker under a rational basis standard, those cases likely would have passed muster under that relaxed review. Instead, the Court emphasized that the statute before it "does not limit the availability or validity of passports," but instead "merely withdraws a governmental [welfare] benefit . . . after an extended absence from this country." Id. In light of the merely "incidental" burden on international travel occasioned by the statute, it was enough that "the provision [was] rationally based." Id. at 177-78.

Agee, like Zemel, is a case in which international travel was restricted by reason of paramount national security concerns. After Philip Agee, a former CIA agent, began a campaign to disclose confidential information, including the identities of undercover CIA agents and sources, the Secretary of State revoked his passport. Agee, 453 U.S. at 283-86. The Court upheld this revocation on constitutional grounds. "[T]he freedom to travel abroad with a 'letter of introduction' in the form of a passport issued by the sovereign is subordinate to national security and foreign policy considerations; as such, it is subject to reasonable governmental regulation." Id. at 306. Revocation of a passport used to jeopardize national security was such a reasonable governmental regulation. "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." Id. at 307 (quoting Aptheker, 378 U.S. at 509). The Court

23

further emphasized that passport revocation was no broader a means of achieving this paramount governmental interest than necessary: "Restricting Agee's foreign travel, although perhaps not certain to prevent all of Agee's harmful activities, is the only avenue open to the Government to limit these activities." Id. at 308.

I read these three cases as entirely in accordance with the standard hinted at in Kent and announced in Aptheker. Zemel and Agee both arose in the context of significant threats to national security, with the former coming in reaction to the harrowing days of the Cuban missile crisis and the latter a response to a public disclosure campaign that jeopardized the lives of CIA assets. In both cases, the Court characterized the governmental interest served by the travel restriction as profound: "the weightiest considerations" in Zemel, "no governmental interest more compelling" in Agee. 381 U.S. at 16; 453 U.S. at 307. Notwithstanding the supreme import of the governmental interest being advanced, the travel restrictions in each case swept no more broadly than necessary. The travel restriction in Zemel was limited to Cuba and permitted individual-specific exceptions, while the passport revocation in Agee was "the only avenue open to the Government to limit [Agee's] activities." 453 U.S. at 308. In both cases, the opinions paid heed to the strength of the governmental interest and the tailoring of means to ends that Aptheker requires. Aznavorian, meanwhile, addressed only an "incidental effect" on international travel by a statute not primarily aimed at restricting it. 439 U.S. at 177. The statute therefore did not "broadly stifle" international travel, unlike the restrictions addressed by Aptheker. 378 U.S. at 508.

24

My review of Supreme Court precedent discerns a standard that clearly falls somewhere between rational basis and strict scrutiny. As I read it, the rule the Supreme Court has both announced and remained faithful to is as follows: substantial restrictions on international travel must advance a "legitimate and substantial" interest and must not sweep much more broadly than necessary. Aptheker, 378 U.S. at 508 (quotation omitted). That rule closely resembles the language used to describe intermediate scrutiny.[11] See Clark v. Jeter, 486 U.S. 456, 461 (1988) ("To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective."); United States v. Reese, 627 F.3d 792, 802 (10th Cir. 2010) ("To pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." (quotation omitted)).

Before determining whether intermediate scrutiny is the appropriate standard to apply, I attend to substantive due process caselaw governing the different levels of scrutiny.

---

[11] It also resembles strict scrutiny insofar as that standard has actually been applied. See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 237 (1995) ("[W]e wish to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact.'" (quotation omitted)); see also Adam Winkler, Fatal in Theory and Strict in Fact: An Empirical Analysis of Strict Scrutiny in the Federal Courts, 59 Vand. L. Rev. 793, 795-96 (2006). The rigidity and inconsistency of the current substantive due process regime suggests to me the infirmity of this atextual approach to the unenumerated constitutional rights. See generally Joel Alicia and John D. Ohlendorf, Against the Tiers of Constitutional Scrutiny, Nat'l Affs. 72 (Fall 2019).

## C

I readily acknowledge that substantive due process claims are generally evaluated under either of two tiers of scrutiny: strict scrutiny or rational basis. But this bifurcated analytical scheme did not arise within and has not been applied to international travel. This context requires a less simplistic, far more sophisticated analysis. My review indicates that the two-fold approach is in significant tension with the procedure the Supreme Court developed in Kent and Aptheker and carried forward in Zemel, Aznavorian, and Agee. Those cases neither reject the proposition that international travel is a fundamental right nor do they diminish international travel by declaring it subject to mere rational basis review. Instead, they weave a much finer fabric. To pass constitutional review, laws limiting international travel may not require a compelling governmental interest, as strict scrutiny would demand. But on the other hand, the Court's cases do not consign international travel to the cavernous abyss of rational basis review.

The importance attached to international travel both historically and culturally is in discord with the typically forgiving evaluation that rational basis review entails. Freedom to cross borders has deep roots into antiquity. In Anglo-American legal history, the liberty to explore lands beyond national borders is a significant aspect of human freedom. The right to exit is itself a safeguard against governmental incursions on other rights and has found legal protection dating far back into our nation's past. Though

26

Supreme Court authority more than these considerations primarily shape my analysis, I am mindful of the historical protection due international travel.

Intermediate scrutiny is the best way to remain faithful to both the full spectrum of Supreme Court caselaw and the role of international travel in the history of our nation and its conception of a well-ordered liberty. It is the appropriate standard under which to review substantial restrictions on international travel. Such a holding might appear to be a departure from the garden-variety two-tiered approach to substantive due process, but it best accords with the international travel cases which form the jurisprudential foundation of our review.[12]

As explained by my colleagues, appellant Maehr did not brief the intermediate scrutiny standard in a manner adequate to permit resolution on the basis of intermediate scrutiny in this case. Maehr did not advocate for intermediate scrutiny; instead, his argument was that international travel is a fundamental right. Appellee Department of State advocated for rational basis review as the appropriate standard. For reasons

---

[12] This accordance is further suggested by the openness shown by other courts to intermediate scrutiny for international travel restrictions. See, e.g., Eunique v. Powell, 302 F.3d 971, 978 (9th Cir. 2002) (McKeown, J., concurring) ("Given the importance of international travel . . . intermediate scrutiny should be the benchmark."); Malhan v. Tillerson, 2018 WL 2427121, at *5 (D.N.J. May 30, 2018) ("The Court . . . finds that both rational basis review and intermediate scrutiny are met" by a passport revocation statute for non-payment of child support); Risenhoover v. Washington Cty. Cmty. Servs., 545 F. Supp. 2d 885, 890 (D. Minn. 2008) ("Assuming arguendo that the Government needs an important reason to interfere with an individual's right to international travel . . . .").

explained above, I do not agree that either is the proper standard of review in cases involving international travel. Because neither party advocated for what I consider to be the proper standard, I must leave the judgment of the district court undisturbed. For procedural reasons, then, I concur in the judgment.

V

The judgment of the district court is **AFFIRMED**.


**MATHESON**, Circuit Judge.

Mr. Maehr argues that international travel is a fundamental right protected by the Fifth Amendment Due Process Clause and that the revocation of his passport thus must be reviewed under strict scrutiny. Supreme Court case law constrains us to affirm the district court's dismissal of the substantive due process claim.[1]

I. **DISCUSSION**

A. *Legal Background*

1. **Due Process Framework**

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The substantive due process doctrine "bars certain government actions regardless of the fairness of the

---

[1] As explained in the per curiam introduction, Judge Phillips joins this separate opinion, which is thus the opinion of the court on Mr. Maehr's substantive due process claim. Judge Lucero concurs only in the judgment affirming dismissal of that claim.

procedures used to implement them."  *Abdi v. Wray*, 942 F.3d 1019, 1027 (10th Cir. 2019) (quotation omitted).  The Supreme Court has found substantive due process violations when (1) government action infringes a "fundamental right" without a "compelling government interest," *see Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (quotation omitted), or (2) government action deprives a person of life, liberty, or property in a way that "shocks the conscience," *see Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998).

In our circuit, "we apply the fundamental-rights approach when the plaintiff challenges *legislative action*, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious *executive action*."  *Halley v. Huckaby*, 902 F.3d 1136, 1153 (10th Cir. 2018).  We apply the fundamental rights approach when, as here, the plaintiff challenges "the concerted action of several agency employees, undertaken pursuant to broad government policies," which is "akin to a challenge to legislative action."  *See Abdi*, 942 F.3d at 1027-28 (emphasis omitted).

Under the fundamental rights framework developed in *Glucksberg*, our analysis has three steps.  <u>First</u>, we "must determine whether a fundamental right is at stake either because the Supreme Court or the Tenth Circuit has already determined that it exists or because the right claimed to have been infringed by the government is one that is objectively among those 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty' such that it is 'fundamental.'"  *Abdi*, 942 F.3d at 1028 (quoting *Glucksberg*, 521 U.S. at 720-21).

29

Second, we "must determine whether the claimed right—fundamental or not—has been infringed through either total prohibition or 'direct and substantial' interference." *Id.* (alteration omitted) (quoting *Zablocki v. Redhail*, 434 U.S. 374, 387 (1978)).

Third, we apply the appropriate level of scrutiny. *See id.* "If a legislative enactment burdens a fundamental right, the infringement must be narrowly tailored to serve a compelling government interest." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1181 (10th Cir. 2009) (citing *Glucksberg*, 521 U.S. at 721). In other words, we apply strict scrutiny. *See id.* "But if an enactment burdens some lesser right, the infringement is merely required to bear a rational relation to a legitimate government interest." *Id.* (citing *Glucksberg*, 521 U.S. at 728); *see also Reno v. Flores*, 507 U.S. 292, 305 (1993) ("The impairment of a lesser interest . . . demands no more than a 'reasonable fit' between governmental purpose . . . and the means chosen to advance that purpose.").

The parties do not dispute that the revocation of a passport substantially interferes with the ability to travel internationally. We thus must determine whether (1) international travel is a fundamental right, and (2) the legislation here passes the applicable level of scrutiny.

## 2. Fundamental Rights

### a. *General background*

The Supreme Court has recognized a narrow category of rights that are, "objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty such that neither liberty nor justice would exist if they were

30

sacrificed." *Glucksberg*, 521 U.S. at 720-21 (quotations and citations omitted). These fundamental rights include "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Id.* at 720 (citations omitted).

When it comes to recognizing new fundamental rights, the Supreme Court has counseled judicial restraint "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *See Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992); *see also Glucksberg*, 521 U.S. at 720. So "identifying a new fundamental right subject to the protections of substantive due process is often an uphill battle, as the list of fundamental rights is short." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 770 (10th Cir. 2008) (alteration and quotation omitted). The plaintiff bears the burden of demonstrating a right is fundamental. *See id.*

b. *Interstate travel*

Long ago, the Supreme Court explained the right of interstate travel is inherent in the fact that "[t]he people of these United States constitute one nation." *See Crandall v. Nevada*, 73 U.S. 35, 43 (1867). Other rights—for example, to petition the federal government at the "seat of government" or to access "the courts of justice in the several States"—would be frustrated if interstate travel were impeded. *See id.* at 44. In the modern era, "[t]he right of interstate travel has repeatedly been recognized as a basic constitutional freedom." *Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 254 (1974).

31

Though this "right finds no explicit mention in the Constitution, . . . freedom to travel throughout the United States has long been recognized as a basic right under the Constitution." *Id.* at 758; *see also Saenz v. Roe*, 526 U.S. 489, 498 (1999) ("The word 'travel' is not found in the text of the Constitution. Yet the 'constitutional right to travel from one State to another' is firmly embedded in our jurisprudence." (quoting *United States v. Guest*, 383 U.S. 745, 757 (1966)). The right is "fundamental to the concept of our federal union." *Guest*, 383 U.S. at 757. Laws burdening the right of interstate travel are therefore subject to strict scrutiny. *See Shapiro v. Thompson*, 394 U.S. 618, 634 (1969), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974); *Dunn v. Blumstein*, 405 U.S. 330, 338-39 (1972).[2]

## B. *Analysis*

Under Supreme Court precedent, (1) the right of international travel is not fundamental, and (2) the statute here passes rational basis review.

---

[2] As we recognized in *Abdi*, "the textual source of the right has been the subject of some debate." 942 F.3d at 1029. The Supreme Court has found support for the right in the Fifth and Fourteenth Amendment Due Process Clauses, *see Jones v. Helms*, 452 U.S. 412, 418 (1981), the Fourteenth Amendment Privileges or Immunities Clause, *see Edwards v. California*, 314 U.S. 160, 178 (1941) (Douglas, J., concurring), the Article IV Privileges and Immunities Clause, *see Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 277 (1993) (citing *Paul v. Virginia,* 75 U.S. 168, 180 (1869)), and the Interstate Commerce Clause, *see Guest*, 383 U.S. at 759. It also has found an Equal Protection Clause violation when a durational residence requirement penalized the right of interstate travel. *See Mem'l Hosp.*, 415 U.S. at 269-70. The textual source of the right of interstate travel is not material here. For our purposes, it is sufficient that the right is "fundamental," *Guest*, 383 U.S. at 757; *Abdi*, 942 F.3d at 1028, and restrictions on it are subject to strict scrutiny, *see Dunn*, 405 U.S. at 338-39.

32

1. **International Travel Is Not a Fundamental Right**

Mr. Maehr has not shown that, within the "binary fundamental-versus-ordinary categorization" of rights within the substantive due process framework, *see* Aplt. Br. at 36, international travel falls on the fundamental side. We (a) recount the primary cases Mr. Maehr relies on, (b) discuss more recent cases from the Supreme Court, and (c) explain why the Supreme Court's cases do not support Mr. Maehr's position.

a. *Kent*, *Aptheker*, and *Zemel*

Mr. Maehr primarily relies on three Supreme Court cases.

First, in *Kent v. Dulles*, 357 U.S. 116 (1958), the Supreme Court, on statutory grounds, held Congress had not delegated to the Secretary of State the power to deny passport applications to alleged communists. *See id.* at 129-30. The Court noted in dicta that "[t]he right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment," and "[t]ravel abroad, like travel within the country, may be necessary for a livelihood." *See id.* at 125-26. It reserved the question of whether it would be constitutional for the Secretary of State to "withhold passports to citizens because of their beliefs or associations." *See id.* at 130.

Second, in *Aptheker v. Secretary of State*, 378 U.S. 500 (1964), the Court addressed the constitutional question reserved in *Kent*. *See id.* at 505-07. The statute at issue in *Aptheker* made it a crime if "any member of a Communist organization which has registered or has been ordered to register . . . attempts to use or obtain a United States passport." *Id.* at 509. The statute applied "whether or not the member actually knows or

33

believes that he is associated with what is deemed to be a [Communist] organization."

*See id.* at 509-14. The Court found the statute

> swe[pt] too widely and too indiscriminately across the liberty
> guaranteed in the Fifth Amendment. The prohibition against
> travel is supported only by a tenuous relationship between the
> bare fact of organizational membership and the activity
> Congress sought to proscribe. The broad and enveloping
> prohibition indiscriminately excludes plainly relevant
> considerations such as the individual's knowledge, activity,
> commitment, and purposes in and places for travel. The
> section therefore is patently not a regulation narrowly drawn
> to prevent the supposed evil, yet here, as elsewhere, precision
> must be the touchstone of legislation so affecting basic
> freedoms.

*Id.* at 514 (quotation and citations omitted).

The Court also found the statute could not be applied constitutionally to the

plaintiffs. *See id.* at 515-17. It noted that "freedom of travel is a constitutional liberty

closely related to rights of free speech and association." *Id.* at 517.

Third, in *Zemel v. Rusk*, 381 U.S. 1 (1965), the Court affirmed the constitutionality

of the Secretary of State's refusal to validate passports of United States citizens bound for

Cuba for reasons of foreign policy and national security. *See id.* at 3, 13, 16. The Court

seemed to suggest the right of international travel is comparable to the right of interstate

travel. It observed that travel within the United States can be restricted to a specific area

for the sake of "the safety and welfare of the area or the Nation as a whole. So it is with

international travel." *See id.* at 15-16.

34

b. *Recent trends*

Since 1978, the Supreme Court has been more restrained about constitutional protection for international travel than it was in *Kent*, *Aptheker*, and *Zemel*.

In *Califano v. Aznavorian*, 439 U.S. 170 (1978), the Court applied rational basis review to uphold a statute that prohibited a Social Security recipient from receiving benefits after spending time abroad, a prohibition which had "an incidental effect on international travel." *See id.* at 171, 177-78. Referring to *Kent*, *Aptheker*, and *Zemel*, the Court noted, "The freedom to travel abroad has found recognition in at least three decisions of this Court," but there is a "crucial difference between the freedom to travel internationally and the right of interstate travel." *Id.* at 175-76. The latter "is virtually unqualified," while the "'right' of international travel has been considered to be no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment." *Id.* (quotation omitted). The Court held that "legislation which is said to infringe the freedom to travel abroad is not to be judged by the same standard applied to laws that penalize the right of interstate travel," *id.* at 176-77—that is, strict scrutiny.

In *Haig v. Agee*, 453 U.S. 280 (1981), the Court reiterated this distinction between the fundamental right of interstate travel and a lesser right to travel internationally. In reviewing the Secretary of State's revocation of a former CIA employee's passport for reasons of national security, the Court stated that "the *freedom* to travel outside the United States must be distinguished from the *right* to travel within the United States." *Id.* at 282-89, 306 (1981).

35

In *Regan v. Wald*, 468 U.S. 222 (1984), the Court upheld a federal regulation prohibiting travel to Cuba. *See id.* at 244. Citing *Aznavorian* and *Agee*, it observed that "[i]n [*Kent*], the constitutional right to travel within the United States and the right to travel abroad were treated indiscriminately," but "[t]hat position has been rejected in subsequent cases." *Id.* at 241 n.25.

c. *Conclusion*

We disagree with Mr. Maehr that the Supreme Court's cases establish a fundamental right to travel internationally.

When analyzing Supreme Court cases, we must interpret older ones "in light of more recent Supreme Court elaboration." *See Independence Inst. v. Williams*, 812 F.3d 787, 793 (10th Cir. 2016). The Court's more recent decisions subordinate the "freedom" to travel internationally to the "right" of interstate travel. *See Agee*, 453 U.S. at 306 (emphasis omitted). Without direction from the Court to do otherwise, we decline to place international travel among those rare rights that are "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *See Glucksberg*, 521 U.S. at 721 (quotations omitted).

Moreover, the Supreme Court's language that most supports Mr. Maehr's position comes from *Kent* and *Aptheker*, in which First Amendment rights were at stake. Indeed, the Supreme Court has suggested that "First Amendment rights . . . controlled in *Kent* and *Aptheker*." *See Regan*, 468 U.S. at 241; *see also Lutz v. City of York*, 899 F.2d 255 (3d Cir. 1990) ("[I]n *Regan* . . . , the Court suggested that *Kent* and *Aptheker* should be

36

viewed as 'controlled' primarily by First Amendment concerns." (quoting 468 U.S. at 241)).  Mr. Maehr has not argued that his First Amendment rights are implicated in this case.

Other circuits have concluded similarly in cases where a parent has challenged a passport revocation for failure to make child support payments.  After canvassing the cases discussed above, a Ninth Circuit judge noted that "[a]t an early point in the development of Supreme Court jurisprudence in this area, the Court seemed to suggest that restrictions upon travel must be looked upon with a jaded eye," but the Court has since "suggested that rational basis review should be applied" to passport revocations that do not raise First Amendment concerns.  *See Eunique v. Powell*, 302 F.3d 971, 973-74 (9th Cir. 2002).[3]  Also, the Second Circuit summarily affirmed a district court's

---

[3] Judge Kleinfeld dissented, finding a fundamental right of international travel subject to strict scrutiny.  *See Eunique*, 302 F.3d at 979, 981.  Judge McKeown concurred.  Though she agreed the Supreme Court "has not . . . declared international travel to be a fundamental right," she also said, "considering the nature of the right to travel internationally, . . . intermediate scrutiny comes the closest to being the proper standard when First Amendment concerns are not implicated." *Id.* at 976.

We have never applied intermediate scrutiny to a substantive due process claim. Guided by the Supreme Court's "oft-stated reluctance to expand the doctrine of substantive due process," *Chavez v. Martinez*, 538 U.S. 760, 776 (2003), and the general principal that "we rely on the parties to frame the issues for decision," *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (quotation omitted), we decline to do so here.

Mr. Maehr has not argued, either in the district court or on appeal, that we should apply intermediate scrutiny to the statute at issue.  Rather, he seems to reject both a rational basis and intermediate scrutiny approach.  *See* Aplt. Br. at 45-46. He argues that the right of international travel is "fundamental" within the substantive due process framework's "binary fundamental-versus-ordinary categorization."  Aplt. Br. at 36.

determination that a substantive due process challenge to a passport revocation was subject to rational basis review. *See Weinstein v. Albright*, No. 00-cv-1193-JGK, 2000 WL 1154310, at *5-6 (S.D.N.Y. Aug. 14, 2000), *aff'd*, 261 F.3d 127, 133 (2d Cir. 2001).[4]

* * * *

Although Mr. Maehr has presented colorable arguments about the importance of international travel as a matter of policy, he has not shown there is a fundamental right of international travel by citing to cases from "the Supreme Court or the Tenth Circuit." *See Abdi*, 942 F.3d at 1028. In recent years, the Supreme Court has distanced itself from any implication from *Kent*, *Aptheker*, and *Zemel* that constitutional protection for international travel is on par with interstate travel. *Aznavorian* and *Haig* in particular counsel against finding a fundamental right to travel internationally. "The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground" in the area of substantive due process. *See Collins*, 503 U.S. at 125. We decline to break new ground today.[5]

---

We thus need not address whether restrictions on international travel may be subject to intermediate scrutiny.

[4] A leading constitutional scholar agrees that the Supreme Court's "[l]ater cases have made it clear that only rational basis review is used for restrictions on foreign travel." Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 940 (6th ed. 2019).

[5] Mr. Maehr also has not convinced us that the right is fundamental based on the history of Anglo-American law dating back to Magna Carta. We decline to find a fundamental right from the thinly sourced 800-year history he presents. By comparison, in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court relied on

## 2. **Rational Basis Review**

Because Mr. Maehr has not established a fundamental right of international travel, we "must consider" whether the government's actions taken under 26 U.S.C. § 7345 were constitutional "under the less-exacting standards of rational basis review." *See Seegmiller*, 528 F.3d at 771-72.

Under rational basis review, we will uphold a law "if there is any reasonably conceivable state of facts that could provide a rational basis for the [infringement]." *See FCC v. Beach Comm'cns, Inc.*, 508 U.S. 307, 313 (1993). This requires "no more than a 'reasonable fit' between governmental purpose . . . and the means chosen to advance that purpose." *Flores*, 507 U.S. at 305. "Our rational basis review is highly deferential toward the government's actions," and "[t]he burden is on the plaintiff to show the governmental act complained of does not further a legitimate state purpose by rational means." *Seegmiller*, 528 F.3d at 772.

The statute before us, 26 U.S.C. § 7345, passes rational basis review. As Mr. Maehr concedes, the federal government has a legitimate interest in "conserving or raising money" through taxes. *See* Aplt. Br. at 29. Congress's decision to further this legitimate interest by providing for revocation of passports for those who have a "seriously delinquent tax debt," 26 U.S.C. § 7345(a), is rational. For example, Congress

---

multiple amicus briefs and detailed historical arguments to determine the meaning of the Second Amendment. *See id.* at 576-628.

could rationally conclude that seriously delinquent taxpayers should be restricted from leaving the country to prevent the secretion of assets overseas or to increase compliance.[6]

## II. **CONCLUSION**

We affirm the district court's dismissal of Mr. Maehr's substantive due process claim.

---

[6] Under the statute, among other things, the "unpaid, legally enforceable Federal tax liability" must exceed $50,000. 26 U.S.C. § 7345(b)(1)(B). We need not address whether a statute that would revoke the passport of a nontaxpayer with a lower outstanding unpaid tax liability, or that swept more broadly than this statute in other ways, would pass rational basis review.